# Exhibit A

Defendant's Notice of Removal

STATE OF NORTH DAKOTA                                   DISTRICT COURT

COUNTY OF CASS                              EAST CENTRAL JUDICIAL DISTRICT

---

Weather Modification LLC, a North Dakota           Court File No.  _____
limited liability company, and Fargo Jet Center
LLC, a North Dakota limited liability
company,

                        Plaintiffs,                          **SUMMONS**

              v.

Neil S. Brackin,

                        Defendant.

---

THE STATE OF NORTH DAKOTA TO THE ABOVE-NAMED DEFENDANT:

[1.]     You are hereby summoned and required to appear and defend against the
Complaint in this action which is herewith served upon you by serving upon the undersigned an
Answer or other proper response within twenty-one (21) days after service of this Summons
upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the Complaint.

[2.]    Dated:  April 7, 2020                **TAFT STETTINIUS & HOLLISTER LLP**


By:      *s/Jason R. Asmus*
    Charles B. Rogers (ND #07415)
    Jason R. Asmus (ND# 09104)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
Telephone:  (612) 977-8400
Fax:          (612) 977-8650
Email:        crogers@taftlaw.com
Email:        jasmus@taftlaw.com

**Attorneys    for    Plaintiffs    Weather
Modification  LLC  and  Fargo  Jet  Center
LLC**

STATE OF NORTH DAKOTA                                    DISTRICT COURT

COUNTY OF CASS                                EAST CENTRAL JUDICIAL DISTRICT

---

Weather Modification LLC, a North Dakota            Court File No. _____
limited liability company, and Fargo Jet Center
LLC, a North Dakota limited liability
company,

              Plaintiffs,                        **COMPLAINT**

    v.

Neil S. Brackin,

              Defendant.

---

[1.]     Plaintiffs Weather Modification LLC d/b/a Weather Modification International

("WMI") and Fargo Jet Center LLC ("Fargo Jet") (collectively, "Plaintiffs"), for their Complaint

against Defendant Neil S. Brackin ("Defendant" or "Brackin"), state and allege the following:

## <u>INTRODUCTION</u>

[2.]     Brackin was WMI's President and also a member of Fargo Jet's Board of

Governors during the relevant time period.  WMI and Fargo Jet recently discovered that Brackin,

in violation of his fiduciary and contractual obligations, engaged in a series of actions designed

to divert funds and business opportunities away from WMI and Fargo Jet for his own personal

benefit or for the benefit of his entities or other entities that he utilized in furtherance of his

scheme.

[3.]     More specifically, WMI completed a cloud seeding project for a customer in India

in 2019.  Brackin diverted the payments made in respect of WMI's work on that project to an

entity he owned, rather than to WMI.  WMI should have received $2,100,000 for the project, but

Brackin's actions shortchanged WMI by **<u>$1,025,000</u>**, which amount remains unpaid.  On top of

that, both before and after his termination, Brackin has attempted to divert other projects away from WMI and Fargo Jet and to other entities he owns or with which he has a relationship.

[4.]    Brackin has been removed from his positions with WMI and Fargo Jet. Nonetheless, his wrongful conduct has substantially harmed the companies.  WMI and Fargo Jet bring this lawsuit to obtain appropriate relief for the substantial and continuing harm resulting from Brackin's wrongful conduct.

## THE PARTIES

[5.]    WMI is a North Dakota limited liability company with its principal place of business at 3802 20th Street North, Fargo, North Dakota 58102-0908.  WMI was formed 1966 as a North Dakota corporation, and it was converted to a limited liability company as of January 1, 2016.   WMI is a family business owned by Patrick and Jim Sweeney (collectively, the "Sweeneys") and non-party SFH, Inc. ("SFH"), a North Dakota corporation owned by trusts owned and controlled by Patrick Sweeney.  WMI is the sole owner of non-party Ice Crystal Engineering, LLC ("ICE"), a North Dakota limited liability company, which is involved in business operations with WMI as described herein.

[6.]    Fargo Jet is a North Dakota limited liability company with its principal place of business at 3802 20th Street North, Fargo, North Dakota 58102-0908.  Fargo Jet is principally owned by SFH and the Sweeneys, and is also involved in business operations with WMI as described herein.

[7.]    Brackin is a former employee and President of WMI, and former member and governor of Fargo Jet.  Upon information and belief, Brackin is a resident of Minnesota, residing at 15612 Highland Heights Drive, Minnetonka, Minnesota 55345.  Brackin regularly conducted business for, communicated with and entered into contracts with WMI and Fargo Jet in Fargo, North Dakota.

## JURISDICTION AND VENUE

[8.]    This Court has subject matter jurisdiction over this lawsuit pursuant to N.D. Const. art. VI, 8 and N.D.C.C. § 27-05-06

[9.]    This Court has personal jurisdiction over the parties pursuant to North Dakota law, including N.D.R.Civ.P. 4(b).

[10.]    Venue is proper in this Court pursuant to N.D.C.C. § 28-04-05.

## BACKGROUND FACTS

**A.    WMI'S AND FARGO JET'S BUSINESS**

[11.]    WMI is a global atmospheric sciences company committed to continued advances in the field of weather modification.  Weather modification, commonly referred to as cloud seeding, is the application of scientific technology that can enhance a cloud's ability to produce precipitation.

[12.]    Fargo Jet is a fixed-base operator ("FBO") and provides aeronautical services such as fueling, hangaring, tie-down and parking, aircraft rental, and aircraft maintenance.  Fargo Jet also leases and sells aircraft.

[13.]    WMI, ICE and Fargo Jet work together in the cloud seeding business.  In simple terms, WMI, ICE and Fargo Jet seed clouds using confidential, proprietary technology that causes clouds to generate precipitation.  In general terms, this is done by flying planes into the clouds and dispensing chemicals from flares into the clouds.  WMI, ICE and Fargo Jet (a) sell products or services that provide cloud seeding services or equipment, including planes and radar systems, (b) modify planes by attaching essential equipment that has been approved for cloud

seeding through supplemental type certificates ("STCs") owned by Fargo Jet,[1] and (c) provide pilots to fly the planes (collectively, the "Weather Modification Services").

[14.]   In general, WMI contracts with governmental customers to provide Weather Modification Services.  This is a critical service to many governments around the world where additional precipitation is needed.  ICE provides the flares and chemicals that are dispensed into the clouds.  Fargo Jet provides planes and other equipment used in the process.

[15.]   Contracting with each governmental entity is usually a lengthy process and generally consists of the following: (a) the government sends to prospective vendors requests for proposals outlining the services that the governmental entity seeks; (b) vendors then submit proposals in response; (c) the government conducts interviews and scoring process for each vendor and then issues a tentative award to one vendor; and (d) the selected vendor then has a period of time to negotiate a final contract with the designated governmental entity.  Because this process usually takes many months (and even years), vendors like WMI are working on contracts for many months before they are awarded.  WMI's processes, specifications, methodologies and financial information utilized in responding to these proposals are confidential and proprietary.

[16.]   WMI, Fargo Jet and ICE have customers around the world.  For example, they provide Weather Modification Services in India, China, Canada, Africa, Saudi Arabia and, of course, the United States.  This business, which at one time was considered of questionable value, has now been widely accepted and embraced by governments and modern science around the world.

---

[1]     STCs are Federal Aviation Administration ("FAA")-authorized modifications to existing planes.  It takes considerable time to obtain approval for STCs from the FAA.  The STCs are critical to the Weather Modification Services and they must be obtained from the FAA so that essential equipment can be attached to the planes to do the weather modification.  This equipment is most often flares and weather monitoring devices.

## B.      BRACKIN'S INVOLVEMENT WITH WMI, FARGO JET AND ICE

[17.]   Brackin was hired by Exclusive Aerospace LLC d/b/a Premier Jet Center ("Premier"), which is a FBO that is wholly owned by Fargo Jet, in October 2014 as the Vice President of Flight Operations.

[18.]   In connection with and as a condition of his employment, on October 1, 2014, Brackin entered into a Confidentiality Agreement & Assignment of Inventions ("Confidentiality Agreement") with Fargo Jet and WMI.  A true and correct copy of the Confidentiality Agreement is attached hereto as **Exhibit 1** and incorporated herein by reference.  The Confidentiality Agreement provides, in relevant part, as follows:

> At Fargo Jet Center, Inc. and Weather Modification, Inc., (the "Company") we are involved in the development, production and sale of technical products and services in a highly competitive market. Breaches of confidentially can seriously impair the success of this Company and, in turn, the success of its Team Members and other service providers.
>
> In order to impress upon you the sensitive nature of your position, the Company requests that you read carefully and sign this Confidentiality Agreement and Assignment of Inventions. By signing the following statement, ***you acknowledge that you fully understand the confidential nature of your position and agree to not breach this confidentiality***.
>
> I, Neil Bracken, having accepted a position at the Company as either a Team Member or an independent contractor/consultant, hereby acknowledge that ***I am fully aware of the confidential nature of my position and my obligation to the Company***. ***I understand and agree that research, production methods, inventions, process methods, software, customer lists, company trade secrets and financial information of all types are extremely confidential, and are the property of the Company***. This specifically includes any software that I author or assist in authoring, modify or am otherwise exposed to through my employment with the Company. ***I realize and agree that any unauthorized disclosure of any such confidential information would be in violation of my responsibilities and this agreement and would injure the Company***. Accordingly, ***I pledge and agree that I will strictly maintain the confidentiality of all of this information, and that I will only release such information upon the proper authorization of my Manager. Upon expiration or termination of my employment with the Company, I will not reveal any confidential information unless specifically authorized and directed to do so by the Company***. I understand that a violation of this confidential relationship is considered gross misconduct and is grounds for

5

dismissal. ***I further acknowledge that disclosure of confidential information may subject me to liability under North Dakota law***. This agreement does not constitute a waiver of the statutory and common law right of the Company for the protection of trade secrets. ***In the event that my employment is terminated by me or by the Company, I will return to the Company, all documents and tangible property on or before my last day of employment***. I further understand and agree that all inventions, software, processes, documents, ideas, concepts and other materials developed through my efforts as a result of my employment with the Company shall immediately become the property of the Company.

\* \* \*

Nothing in this Agreement shall be construed to convey any rights to permanent employment or disturb the at-will employment relationship between myself and the Company. I understand that either party may terminate the employment relationship at any time, for any reason.

(Emphasis added).

[19.]   In connection with and as a condition of his employment, on October 1, 2014, Brackin acknowledged his receipt of an agreement to abide by the Team Member Handbook of WMI and Fargo Jet.  A true and correct copy of the acknowledgement form signed by Brackin is attached hereto as **Exhibit 2** and incorporated herein by reference.  The Team Member Handbook was revised as of November 1, 2017, and Brackin continued thereafter to be subject to it.  A true and correct copy of the Team Member Handbook, revised as of November 1, 2017, Agreement is attached hereto as **Exhibit 3** and incorporated herein by reference.

[20.]   With respect to confidentiality, the Team Member Handbook provides, in relevant part, as follows:

Confidentiality is an essential part of the Company's services. Our customers and co-workers give us private information about themselves and/or their business and rightfully trust us to keep this information in confidence. Confidential information includes, but is not limited to:

- Customer information such as accounts receivable balances, credit worthiness, assets owned or operated and project information;

- Technical information used on Company operations and;

6

- Team Member information such as wage information, medical data, account information or personal issues discussed in confidence.

A Team Member's role in privacy protection is critical. ***Team Members may be exposed to confidential information regarding customers and/or Company business that must never be discussed with anyone including family members or other Company Team Members. Doing so damages the customer's trust in us and can result in loss of business or possibly even legal action***. Team Members are required to sign a Confidentiality Agreement upon employment.

Lack of discretion in these matters is very serious. Regardless of position, title and status in the Company, unauthorized discussion and/or release of confidential information may result in disciplinary action, including termination of employment.

(Emphasis added).

[21.]   With respect to conflicts of interest, the Team Member Handbook provides, in

relevant part, as follows:

Conflicts of interest are situations, in which the Company Team Members may have the opportunity to influence the Company administrative or business decisions in ways that could lead to personal gain, give improper advantage to self or others or interfere with the protection of information. A Team Member's position, interest and employment obligation shall be to the Company while employed. ***Company property, information or business opportunities may not be used for personal gain.*** If there is a question as to whether a conflict of interest will exist, Team Members should consult their Manager

(Emphasis added).

[22.]   With respect to outside employment, the Team Member Handbook provides, in

relevant part, as follows:

The Company respects a Team Member's right to participate in activities outside of their employment, which do not conflict with the interests of the organization. If considering outside employment, ***Team Members should avoid any situation which will adversely affect their job performance or detract from their full attention and scheduled hours at the Company***.

***A Team Member is not permitted to engage in any activity as a self-employed individual or hold employment at another Company or business which is in any way competitive with the Company business or which would adversely affect your employment with the Company.*** This would include reselling parts or providing services to other companies or persons that could be customers of the

Company. Team Members are encouraged to speak with their Manager about outside employment.

(Emphasis added).

[23.]   Less than a year after being hired by Premier, Brackin became an employee of WMI and was appointed President of the company on September 8, 2015.  Brackin remained in that position until he was terminated on March 3, 2020.

## C.   BRACKIN'S PURSUIT OF A PURCHASE OF WMI AND ICE

[24.]   In early 2018, the Sweeneys began to explore the possibility of selling WMI and ICE.  Brackin expressed an interest in purchasing the companies.  Through the summer of 2018, the parties discussed the terms of a deal, and negotiated a term sheet for Brackin to purchase the companies.  SFH also contemporaneously agreed to not pursue a sale of WMI and ICE to a third party for a specified period of time to allow Brackin to commit the necessary time, effort and money to the process of negotiating and completing the purchase.

[25.]   Brackin incorporated Specialty Aviation Holdings Corporation ("SAHC"), a Delaware corporation, on October 12, 2018.  Based on conversations with Brackin, the draft term sheet, and a draft purchase agreement, WMI, ICE and the Sweeneys understood that Brackin formed SAHC to be the purchaser entity for WMI and ICE.  It subsequently became clear that Brackin instead used SAHC, and other entities he owned or with which he had a relationship, for other nefarious purposes as described below.

[26.]   Brackin pursued partners in 2018 and throughout 2019 to provide the debt and equity necessary to buy WMI and ICE.  During that time period, Brackin and the Sweeneys continued to exchange drafts of a potential purchase agreement, and they extended the exclusivity period for their negotiations to allow Brackin to continue his efforts to locate capital. Multiple times at the end of 2018 and in 2019, Brackin assured the Sweeneys he would have the

capital and be ready to close.  Upon information and belief, however, Brackin was unable to raise the requisite capital, in part, because his proposals to prospective investors demanded that he would own a majority of the companies and exercise control despite investing only a small amount of the capital needed to buy the companies.

[27.]   Brackin was involved with other entities in 2019 in connection with his efforts to obtain capital, including the following:

> (a)   At some point in late 2018 or early 2019, Brackin met Subhash Patel ("Patel"), an individual who does business regularly in India and is the principal executive of Sunag, LLC ("Sunag"), a New Jersey limited liability company, to discuss working together in connection with, and after, Brackin's purchase of WMI and ICE.
>
> (b)   Sunag and Brackin formed WMI Sunag LLC ("WMI Sunag"), a New Jersey limited liability company, on March 29, 2019.  A true and correct copy of WMI Sunag's Certificate of Formation is attached hereto as **Exhibit 4** and incorporated herein by reference.  WMI Sunag's Certificate of Formation states that its members/managers are WMI and Sunag.  Sunag has confirmed that WMI Sunag has two members: (i) WMI owning a 51% membership interest; and (ii) Sunag owning a 49% membership interest.
>
> (c)   On May 24, 2019, Brackin, through SAHC, purchased Advanced Radar Company, LLC ("ARC"), a Colorado limited liability company.  WMI and ARC are competitors in the radar business.  The purchase price paid by SAHC for ARC was funded primarily via a promissory note and an earn out to be paid in the future.  Brackin purchased ARC without any notice to or discussion with WMI or the Sweeneys.

[28.]   A summary chart of the entities that Brackin owned and/or utilized in furtherance of his scheme is set forth below:

| ENTITY NAME | OWNER |
|---|---|
| Sunag<br>• New Jersey LLC,<br>• Formed in February 2016 | Patel |
| SAHC<br>• Delaware corporation<br>• Formed on October 12, 2018 | Brackin |
| WMI Sunag<br>• New Jersey LLC<br>• Formed on March 29, 2019 | WMI (51%)<br>Sunag (49%) |
| ARC<br>• Colorado LLC<br>• Purchased on May 24, 2019 | SAHC |

[29.]   Based on assurances that Brackin would proceed to closing, the Sweeneys were patient and continued to allow Brackin the time to raise the capital until early 2020, when it became apparent that Brackin did not have the necessary capital to purchase the companies. Moreover, Brackin sought to materially change the purchase terms from what had been negotiated in the draft purchase agreement months before.

[30.]   It was at this point in time that things began to unravel for Brackin when his misconduct vis-à-vis WMI and Fargo Jet was revealed.  The misconduct that WMI and Fargo Jet have been able to uncover to date is described below.  Their investigation continues.

**D.   BRACKIN'S MISAPPROPRIATION OF PROJECT PAYMENTS**

[31.]   Throughout 2018, 2019 and into early 2020, Brackin was supposed to be focused on leading WMI, and complying with his fiduciary and contractual duties to WMI.  As has been recently revealed, however, Brackin orchestrated a series of transactions to take or try to take company assets from WMI.

[32.]   For many years WMI provided Weather Modification Services to states in India. It is customary when doing business in India for a foreign company like WMI to contract with a company in India, and that Indian company then contracts directly with the relevant state in India.  Kyathi Climate Modification Consultants LLP ("KCMC") is the Indian company that historically has contracted with various states in India to provide cloud seeding.  For the Weather Modification Services it provided in India, WMI would usually enter into subcontracts with KCMC contemporaneously with KCMC contracting with the relevant state.  WMI and KCMC would typically work for months to procure these projects.

[33.]   In 2019, WMI had several projects in India, one of which was for the state of Maharashtra.  In pursuit of that project, Brackin established and used a multi-entity structure to divert funds and business opportunities away from WMI and to his company, SAHC, or other entities that he utilized in furtherance of his scheme.

### 1.    The Maharashtra project contracts

[34.]   In 2019, the state of Maharashtra submitted requests for proposal for a cloud seeding project, and KCMC and WMI submitted a bid proposal in response thereto.  Brackin was the person primarily responsible at WMI for the Maharashtra project and managing the bid process.  Brackin prepared the proposal for the project, which included the price that WMI was to be paid for the project totaling $2,100,000.  Brackin's proposal was approved by WMI and the Sweeneys.  KCMC and WMI were notified in late June 2019 that they had been awarded the project.  Brackin advised WMI executives that Sunag was going to be involved in the project to ensure full payment of the $2,100,000 project price to WMI, but no agreement was ever tendered.

[35.]     On July 1, 2019, KCMC and the state of Maharashtra entered into a cloud seeding contract.  A true and correct copy of the cloud seeding contract between KCMC and state of Maharashtra is attached hereto as **Exhibit 5** and incorporated herein by reference.

[36.]     Brackin secretly had KCMC contract with WMI Sunag (which WMI co-owned with Sunag) for the work to be performed for the Maharashtra project, even though WMI was the company that would perform the work.

### 2.     SAHC's Short Term Loan Agreement with Sunag

[37.]     On July 1, 2019, the same day KCMC contracted with the state of Maharashtra, SAHC[2] entered into a purported Short-Term Loan Agreement ("Loan Agreement") with Sunag. A true and correct copy of the Loan Agreement is attached as **Exhibit 6** and incorporated herein by reference.  As explained below, the Loan Agreement evidences an unauthorized diversion of funds arranged by Brackin in relation to the Maharashtra project.

[38.]     Section 1.1 of the Loan Agreement provides that (a) SAHC has undertaken a project with WMI Sunag and KCMC for the "Maharashtra State Government," (b) SAHC is "funding the work on" the Maharashtra project "thru [sic] WMI Sunag," and (c) Sunag may fund the loan "directly to" SAHC or "thru [sic] WMI Sunag."

[39.]     Sections 1.2, 1.3, 1.4 and 1.5 of the Loan Agreement provide that Sunag agrees to loan to SAHC a total of $1,900,000 for a six-month period at an interest rate of 7.5%, with an additional fee of $128,750 to be paid to Sunag.

---

[2]       SAHC states in the Loan Agreement that it is doing business as "Weather Modification International."  This is a tradename owned by WMI, not by SAHC.  A true and correct copy of the Certificate of Trade Name Registration for Weather Modification International is attached as **Exhibit 7** and incorporated herein by reference.

[40.]   Section 1.6 of the Loan Agreement provides that the principal, plus interest and fees, are due on January 1, 2020.  The total amount owed by SAHC to Sunag was $2,100,000 as follows:

| | |
|---|---|
| Principal | $1,900,000 |
| Interest | $71,250 |
| Fees | $128,750 |
| **TOTAL** | **$2,100,000** |

This total of $2,100,000 is the exact same amount as the price that should have been paid to WMI for the Maharashtra project.

[41.]   Section 1.6 of the Loan Agreement provides that loan proceeds will be remitted on July 1, 2019, the date of the Loan Agreement, to "enable [SAHC] to fund working on" the Maharashtra project.

[42.]   Section 1.7 of the Loan Agreement provides that the loan is to be repaid in four installments, which aligned approximately with the anticipated payments on the Maharashtra contract from KCMC, and all payments received by WMI Sunag from KCMC are to be treated as repayment of the loan.  Section 1.7 further provides that, if there is "any non-payment by KCMC," the shortfall shall be SAHC's responsibility.

[43.]   The Loan Agreement evidences Brackin's misconduct and breaches of his fiduciary and contractual duties to WMI.  In summary, Brackin participated in creating a new entity, WMI Sunag, of which the Sweeneys were not aware.  Brackin then had funds from the Maharashtra project funneled through WMI Sunag to his newly-formed company, SAHC, to WMI's detriment.

[44.]   First, the Loan Agreement provides that SAHC was to take the $2,100,000 paid by KCMC and apply it to the principal, interest and additional fees to be paid to Sunag as lender under the Loan Agreement.

13

[45.]    Second, the Loan Agreement references a purchase order issued to WMI Sunag from KCMC.  This purchase order properly should have been issued to WMI, not WMI Sunag.

[46.]    Third, the Loan Agreement provides that the loan proceeds were to be used to fund the costs of performing the work needed to complete the Maharashtra project.  WMI did all of the work for the project without receiving full payment for the project.

[47.]    Fourth, in the Loan Agreement, SAHC used a tradename owned by WMI without its consent.

[48.]    These actions evidence, among other things, a usurpation of corporate opportunity, conversion and misappropriation of a corporate asset and use of confidential information in breach of Brackin's fiduciary and contractual duties owed to WMI.

### 3.    SAHC's July 2019 Memorandum of Understanding with Sunag

[49.]    On July 9, 2019, just eight days after executing the purported Loan Agreement, SAHC and Sunag entered into a purported Memorandum of Understanding ("MOU No. 1").  A true and correct copy of MOU No. 1 is attached as **Exhibit 8** and incorporated herein by reference.

[50.]    The "Whereas" clause in MOU No. 1 states that Brackin and Patel met in Minneapolis on July 8 and 9, 2019, which was apparently their fourth meeting regarding "joint business development."   MOU No. 1 states that Brackin and Patel discussed the following "option":

(a)    Sunag loans a total of $2,000,000 to WMI Sunag, consisting of $1,900,000 in principal and a fee of $100,000 due to Sunag.

(b)    Sunag made an initial disbursement of $850,000 to WMI Sunag on July 2, 2019.

(c)    WMI Sunag transferred the $850,000 received from Sunag to SAHC.

14

(d)     Sunag agrees to make four additional payments totaling $1,150,000 in July and August 2019, for a grand total of $1,900,000.

[51.]   MOU No. 1 also states that KCMC will pay to WMI Sunag the sum of $2,100,000 for the Maharashtra project.  It further provides that $2,000,000 will go to Sunag, with the remaining $100,000 retained by WMI Sunag as "profit."

[52.]   Brackin signed MOU No. 1, which is on SAHC letterhead, purportedly on behalf of "SAHC and WMI" even though the document benefits SAHC and Brackin personally. Brackin never disclosed MOU No. 1 to the Sweeneys or anyone else at WMI at the time he signed it.

[53.]   MOU No. 1 evidences further wrongdoing by Brackin.

[54.]   First, MOU No. 1 describes the arrangement between SAHC and Sunag in materially different terms than the Loan Agreement, which had been executed just a few days earlier:

(a)     The loan amount is identified as $2,000,000, rather than $1,900,000.

(b)     The loan is not made in full on July 1, 2019, but rather is to be made in installments in July and August, 2019.

(c)     The payments from Sunag now are to be made to SAHC, and not WMI Sunag.

(d)     Sunag was to receive $2,000,000 of the $2,100,000 paid by KCMC for the Maharashtra project to repay Sunag's $1,9000,000 loan and provide Sunag with an additional $100,000 fee.  The remaining $100,000 from the KCMC payment would be retained by WMI Sunag as a profit.

[55.]   Second, although MOU No. 1 provides that loan payments are to be made to SAHC, the Maharashtra project payments received by WMI Sunag from KCMC were purportedly to be paid directly to Sunag to repay the loan to SAHC.  As the President of WMI, the company that actually performed the cloud seeding work, Brackin was obligated to ensure that project payments due to WMI for its work were not diverted.

15

### 4.    SAHC's August 2019 Memorandum of Understanding with Sunag

[56.]    On August 28, 2019, SAHC [3] and Sunag entered into a second purported Memorandum of Understanding ("MOU No. 2").   A true and correct copy of MOU No. 2 is attached as **Exhibit 9** and incorporated herein by reference.   While MOU No. 2 focuses on broader commitments that Sunag was going to make in potential ventures with Brackin—to the exclusion of WMI—several provisions in MOU No. 2 concern the "Maharashtra State Government Project."

[57.]    Section 5 of MOU No. 2 states that Sunag had provided WMI Sunag $1,500,000 for the Maharashtra project.  Section 7 of MOU No. 2 states that the cash outlays by Sunag for the Maharashtra project are $1,900,000—not the $2,000,000 that is stated in MOU No. 1, or the $2,100,000 project price that was to be paid to WMI.

[58.]    Although MOU No. 2 states that it is between SAHC and Sunag, Brackin again signed the document purportedly as President of WMI.

[59.]    MOU No. 2 evidences Brackin's use of WMI assets for his own benefit, in an attempt to leverage WMI's assets in support of developing a personal broader relationship with Sunag.

### 5.    SAHC's January 2020 Agreement with Sunag

[60.]    In early 2020, the Sweeneys were becoming concerned about the lack of transparency from Brackin about the Maharashtra project and other matters.  On January 21, 2020, the Sweeneys, their CFO and an advisor met with Brackin in Fargo, North Dakota.  The purpose of the meeting was to discuss the Maharashtra project and the funds for all of WMI's projects in India.

---

[3]      Like the Loan Agreement, SAHC states in MOU No. 2 that it is doing business as "Weather Modification International."   Again, this is a tradename owned by WMI, not by SAHC.

[61.]   Two days after the meeting, Brackin, through SAHC, entered into yet another purported agreement with Sunag, this one titled Sunag and SAHC Agreement (the "S&S Agreement").   A true and correct copy of the S&S Agreement is attached as **Exhibit 10** and incorporated herein by reference.   The S&S Agreement evidences more misconduct by Brackin.

[62.]   The S&S Agreement provides as follows:

Sunag understands that SAHC has need for funds necessary to advance the Transaction, including payments to legal counsel, financial advisors, appraisers, and others, and for reimbursement of Transaction-related costs to obtain commitments to purchase debt and equity from lenders and investors and to lease equipment from leasing companies.

***On or about July 3, 2019, Sunag as Lender provided a loan of $850,000.00 to SAHC as Borrower with the intent of assisting with payment of these amounts***.  The attached Promissory Note further describes the terms and conditions of the loan.[4]

***On or about July 3, 2019, Sunag as Lender provided a loan of $1,900,000.00 to WMI as Borrower with the intent of assisting with payments to support the Maharashtra Cloud Seeding Program.***

On our [sic] about October 11, 2019, Sunag committed direct funding on behalf of WMI in the amount of $500,000.00 and Fargo Jet Center (FJC) in the amount of $500,000.00 towards Bid Bonds in support of the Indian Institute of Tropical Meteorology (IITM) project.

Mr. Suhash Patel and Mr. Neil Brackin also discussed and explored funding from Sunag in support of WMI and SAHC transactions as per MOU's dated July 9, 2019 and August 31, 2019.

Sunag will provide funding to WMI in the amount of $850,000.00 with effective date of April 1, 2020.

WMI will provide an exclusive agreement with Sunag for bidding, executing and completion of Maharashtra India Cloud Seeding programs from 2020-23 and the IITM IAS Project listed herein.

---

[4]     WMI eventually obtained in March 2020 a copy of the purported promissory note for $850,000, dated July 3, 2019, but it purports to be between SAHC and Sunag Corporation (USA), which is an entity that is not party to any other document.  A true and correct copy of the July 3, 2019 Secured Promissory Note is attached as **Exhibit 11** and incorporated herein by reference.

> If the above exclusive agreement between WMI and Sunag is not established, executed or is cancelled, the Promissory Note from Mr. Neil Brackin to Sunag dated January 23, 2019 will becomes effective.

(Emphasis added).

[63.]   The S&S Agreement evidences further wrongdoing by Brackin.

[64.]   First, the S&S Agreement was another attempt by Brackin to conceal the true intent of the previous transactions wherein he arranged for the diversion of funds owed to WMI to himself and/or his company, SAHC.

[65.]   Second, the S&S Agreement also suggests for the first time that there was a direct loan from Sunag to SAHC for $850,000 and second loan to WMI for $1,900,000.  There was no loan to WMI, and all documents prior to the S&S Agreement state that the loan was made to SAHC on July 1, 2019 for $1,900,000.  Moreover, there is no prior evidence of any loan to SAHC for $850,000.

**6.      Brackin continues to obfuscate and delay**

[66.]   In light of Brackin's above-described actions, on February 11, 2020, WMI's CEO, Patrick Sweeney, sent a letter to Brackin to notify him of various issues pertaining to his actions.  A true and correct copy of this February 11, 2020 letter is attached as **Exhibit 12** and incorporated herein by reference.  The February 11, 2020 letter provides as follows:

> This letter is to serve notice to you because of your continuing lack of communication and disregard for the direction that I have given you with your current position in Weather Modification International (WMI).
>
> You will NOT, without my permission in writing, do the following:
>
> - enter into any contracts that are in any way related to or involve WMI, directly or indirectly. The Sunag arrangements are an example of where you were not authorized, this situation will be reviewed in detail and dealt with appropriately.
>
> - submit any budgets or proposals

- hire anyone

- no travel for you or any employees without my approval

- all emails that involve WMI and ICE in any way, directly or indirectly, shall be done on WMI email system

- WMI and Ice letterhead and logo's will not be used by you for any purpose other than WMI and ICE business

- submit weekly written reports to me regarding WMI and ICE communications with clients and prospects of current and future potential contracts

***Further, I would like you to probe further regarding what money Sunag already has received from India on the Maharashtra contract on our behalf. You promised the Fargo office a $900,000 payment 3 weeks ago and nothing has arrived. WMI must collect $2,100,000 for our services in Maharashtra. Also, the other India payments are due, process these payments to WMI immediately***.

In addition, you must arrange a meeting with Sunag as soon as possible, either in Fargo or in New Jersey. I am free to travel to either location on short notice.

Finally, arrange a call with you and me to your equity source (Midwest) for an update on their progress.

(Emphasis added).

[67.]    Brackin signed the February 11, 2020 letter on February 13, 2020 to acknowledge his receipt and understanding thereof.  The same day, Brackin also emailed WMI to provide some of the requested information.  A true and correct copy of Brackin's February 13, 2020 email is attached as **Exhibit 13** and incorporated herein by reference.  Brackin's February 13, 2020 email stated, in relevant part, the following:

KCMC assured a small payment today to help payroll

KCMC assured balance of the total $800K due will be sent Friday or Monday

Final Karnataka remains as previously noted for mid-April after arbitration

***Sunag team is in India until February 22***

***Meeting requested and to occur in Fargo the week of February 23***

19

> Update on IITM and Maharashtra 2020 expected
>
> ***Sunag commitment remains for $900k no later than April 1***

(Emphasis added).

[68.]   When the meeting with Sunag was not confirmed for the week of February 23, 2020 as promised, WMI followed up with another letter to Brackin on February 24, 2020.  A true and correct copy of this February 24, 2020 letter is attached as **Exhibit 14** and incorporated herein by reference.  The February 24, 2020 letter provides, in relevant part, as follows:

> First, I want to make sure we continue to be very clear regarding the Maharashtra contract.
>
> ***In July, 2019, you entered into a contract with KCMC on behalf of an entity called WMI Sunag regarding the Maharashtra project. As you know, you never informed us of the fact that you were doing that. And, this is inconsistent with how all contracts in the past have been executed.***  In the past, they were always executed by WMI. You were at that time the President of WMI and in that capacity should have executed that contract on behalf of WMI.
>
> ***You then provided to WMI and to us the pricing proposal which shows that the transaction was with WMI and not WMI Sunag. That pricing proposal showed that $2.1 million was to be paid WMI. The lack of disclosure of WMI Sunag continued to keep us uninformed of the contract you signed in February***.
>
> ***Then, when you entered into the wet lease in June, 2019, you had the agreement executed by WMI and Fargo Jet, with no mention of WMI Sunag. This further kept us uninformed***.
>
> When you originally informed us in the summer of Sunag, you stated that Sunag was going to be a factoring company, meaning that Sunag would (a) ensure the timely payment of the WMI receivables from Maharashtra and (b) take the risk of nonpayment from Maharashtra. You did not provide us any documentation to support your assertion. In fact, and unfortunately, Sunag did not ensure the timely payment of the WMI receivables as we are still owed approximately $900,000.
>
> After inquiring of you on several occasions in the Fall and Winter about the payments and the arrangements with Sunag, you generated and had signed by Sunag in January 2020 a letter to "clarify" the relationship with Sunag that you initiated. For the first time, the relationship was described as Sunag providing a loan to WMI. You never provided us the terms of the loan or a promissory note. More importantly, fundamentally, there never was a loan. Sunag never advanced

any money to WMI on the Maharashtra project. Instead, it has received funds from Maharashtra that it has not been provided to us.

***We have now come to learn from Prakash [of KCMC] that Sunag received full payment from KCMC for the Maharashtra contract. When I asked Prakash recently why Prakash paid funds to Sunag instead of the WMI, Prakash stated that you told him to do so. These are funds that are owned by and owed to WMI.***

You promised in no uncertain terms that those funds would be paid in full at the end of January when we met with you in Fargo around January 20. You now indicate that the funds will be paid on April 1, 2020. ***We never agreed to Sunag's involvement in the Maharashtra project. We never agreed to a delay in payment and we are not now agreeing to a further delay in payment. The funds are with Sunag because of contracts you signed and instructions you gave to others. Please correct the error and have the funds directed to us immediately***.

Furthermore, in your email below, you committed that Sunag will meet with us upon return from India. You further said that they are arriving back in the United States tomorrow. Similarly, in your email dated January 28, 2020, you stated that Sunag "would like to have a meeting in mid-February in Fargo to review the past year and solidify the plans for 2020." I request that this meeting occur next week, before the end of the month of February. Please ensure that the prompt payment of the money they have received from Maharashtra project is on the top of the agenda.

Separately, you have informed us that Sunag also has lent you $850,000. Those transactions are completely separate from WMI. We are not part of those transactions and they should not, in any way, relate to the obligations you have to cause the remaining Maharashtra funds to be provided to WMI.

Furthermore, you made us aware of and we participated in the transaction to have Sunag put up bonds for future work for WMI. This is a completely separate transaction from the Maharashtra transaction and should be treated as such.

(Emphasis and bracketed information added).

## E.    RECONCILIATION OF SUNAG PAYMENTS

[69.]    In early March 2020, Patrick Sweeney contacted Patel, President and CEO of Sunag, to obtain information to understand the relationship between Sunag and Brackin and to account for the funds in respect of the Maharashtra project that rightfully belong to WMI.

[70.]   Patel thereafter provided an accounting of the transactions as of February 27, 2020.  A true and correct copy of this accounting is attached as **Exhibit 15** and incorporated herein by reference.  The accounting is depicted below:

| WMI SUNAG INVESTMENT | | 2/27/2020 | | |
|---|---|---|---|---|
| PAYMENT TO SPECIALTY AVIATION HOLDING | | | | |
| DATE | AMT | | FROM | PUROPSE |
| 7/3/2019 | $ | 850,000.00 | CHASE BANK | 50 % ADV OF 1.9 M |
| 7/19/2019 | $ | 300,000.00 | SBI | ADV OF 1.9 M |
| 8/1/2019 | $ | 350,000.00 | SBI | ADV OF 1.9 M |
| 11/4/2019 | $ | 200,000.00 | SBI | ADV OF 1.9 M |
| 12/11/2019 | $ | 200,000.00 | SBI | |
| | $ | 1,900,000.00 | TOTAL AMT PAID | |

[71.]   This accounting describes the transactions as Sunag's "investment" in WMI Sunag reflects four payments from Sunag to WMI Sunag between July and December 2019, totaling $1,900,000.

## F.   THE MOTIVATION FOR BRACKIN'S IMPROPER ACTIONS

[72.]   Brackin engaged in the above-described misconduct because he was unable to locate the capital necessary to close on his planned purchase of WMI and ICE.  Not only was Brackin incurring transactional expenses that he could not pay, but he had also purchased ARC through SAHC, and he needed money to satisfy his payment obligations in connection therewith.

[73.]   Brackin acted in 2019 as if his purchase of WMI had closed and he already owned WMI, so he could direct funds as he saw fit.  But, the transaction did not close and Brackin did not own WMI.  At a minimum, Brackin misappropriated nearly $1,000,000 from WMI and used it and other WMI corporate assets for his own benefit.  WMI's investigation continues.

22

### G.   WMI'S DAMAGES RELATING TO THE MAHARASHTRA PROJECT

[74.]   Of the $2,100,000 that KCMC paid for the Maharashtra project—all of which should have been directed to WMI in the first place—WMI has received just $1,075,000.  The following chart identifies the flow of funds Brackin arranged from Sunag to WMI Sunag, and from WMI Sunag to SAHC, and from SAHC to WMI:

| Date | (1) Payments from Sunag to WMI Sunag | (2) Payments from WMI Sunag to SAHC | (3) Payments from SAHC to WMI |
|---|---|---|---|
| 7/3/19 | $850,000 | $850,000 | |
| 7/12/19 | | | $500,000 |
| 7/13/19 | $300,000 | $300,000 | |
| 8/1/19 | $350,000 | $350,000 | |
| 9/20/19 | | | $500,000 |
| 11/4/19 | $200,000 | $200,000 | |
| 12/11/19 | $200,000 | $200,000 | |
| 12/11/19 | | | $75,000 |
| **Total** | **$1,900,000** | **$1,900,000** | **$1,075,000** |

[75.]   By virtue of Brackin's conduct, **$1,025,000** of the full project price was diverted away from WMI and remains due and owing from Brackin.

### H.   BRACKIN IS TERMINATED AND MORE MISCONDUCT IS DISCOVERED

[76.]   On March 3, 2020, WMI terminated Brackin's employment with the company, as well as his status as WMI's President.  Notwithstanding his termination, Brackin continues to wrongfully hold himself out publicly, including on his LinkedIn profile,[5] as WMI's President.

[77.]   Following Brackin's termination, WMI discovered that Brackin had taken various actions, in violation of his fiduciary and contractual obligations to WMI and Fargo Jet, to divert projects or potential projects from WMI and Fargo Jet to Brackin personally or his entities or other entities that he utilized in furtherance of his scheme.

---

[5]   *See* Ex. 16, https://www.linkedin.com/in/neil-brackin-32b18026/ (last visited 4/2/20).

[78.]   Brackin has knowledge about the projects identified below and WMI's proprietary methodology, processes, specifications and financial information only as a result of his role as an employee and President of WMI.  Brackin was the lead person on the projects for WMI and had information and knowledge about the contracts or proposals for each of them, including all of the terms related thereto such as the customer, the nature of the project, the financial terms, the methodologies, processes, specifications, and the companies and specific people in those companies who are involved in the project.   All of this project-related information and knowledge is WMI's property and is proprietary and confidential.

### 1.   The ULTRA project

[79.]   In the summer of 2019, WMI was retained as a subcontractor for the University of North Dakota on a project with SpaceX and NASA.  One of the other vendors on that project was Aerospace Corp. ("Aerospace").  WMI has also worked on other projects with Aerospace.

[80.]   Throughout 2019 and into 2020, Aerospace and WMI, through Brackin, worked on a new potential project called "ULTRA" that is an advanced system to aid NASA and others to monitor several key elements for the launch of rockets.   The ULTRA project uses sophisticated equipment mounted on airplanes surrounding the launch site to, among other things: (a) track possible intrusions into the launch area; (b) monitor weather from within the clouds in proximity to the launch site; and (c) monitor the launch and release of key rocket boasters after launch.  The specific details of the ULTRA project are confidential and clearance from NASA is required for any release of information about the project.  Proposals for the ULTRA project have been made to various entities around the world, including entities in Japan and India.

[81.]   WMI has received clearance and approval from NASA to receive confidential information regarding the ULTRA project.  Neither Brackin individually, nor any of the other

entities described above in which he has an interest or that he used in furtherance of his scheme are authorized to receive or have confidential information relating to the project.

[82.]    Nonetheless, following his termination from WMI, Brackin has sought to steer the ULTRA Project from WMI to his company, ARC.   On March 18, 2020, after Brackin was terminated by WMI, Brackin sent an email to two executives at Aerospace with whom he has been working, as a follow up to his phone call with them earlier that day:  "As discussed, I truly look forward to our continued collaboration to assure ULTRA continues to move forward and become the success we all envision."  In response to Brackin's email, the Aerospace executive directed an Aerospace employee in an email to "create a new lead for Neil under his new company name … Advanced Radar Company."

[83.]    Further, after the Aerospace executive became aware of the Brackin's termination, the Aerospace executive sent an email to WMI seeking to be paid for invoices for the services of Aerospace to WMI purportedly from July through December, 2019.  Brackin had never before submitted these invoices to WMI's accounting department for payment, and WMI has no knowledge of the services for which Aerospace is apparently seeking payment.  To the extent Aerospace did, in fact, perform services, they were in furtherance of Brackin's scheme to usurp corporate opportunities from WMI, and any associated expenses were not authorized by and are not the responsibility of WMI.

### 2.    The IITM project

[84.]    WMI has in the past provided Weather Modification Services and planes to the Indian Institute of Tropical Meteorology ("IITM") in India.  WMI and IITM have entered into contracts annually for projects.  Just like its projects with the Maharashtra state, WMI works as a subcontractor for KCMC.

[85.]    In 2019, IITM submitted a request for proposal for a substantial project to be awarded for 2020.   WMI recently learned that, without its knowledge or consent, Brackin submitted a proposal in 2019 on behalf of WMI Sunag and not WMI.   In addition, WMI also learned that Brackin's proposal provided that the aircraft modifications and maintenance could be performed by a competitor of Fargo Jet, Norwegian Special Mission ("NSM"), rather than Fargo Jet.

[86.]    Brackin's actions in attempting to divert the IITM project from WMI and Fargo Jet were in violation of his fiduciary and contractual duties owed to WMI and Fargo Jet. Additionally, Brackin improperly disclosed and used WMI's and Fargo Jet's confidential and proprietary information.   WMI's and Fargo Jet's investigation of Brackin's conduct in connection with the IITM project continues.

### 3.    The ASO project

[87.]    Airborne Snow Observatories, Inc. ("ASO") measures and tracks snow, snowmelt, and water resources from mountains around the globe and conducts quantitative, physically-based and accurate remote sensing and snowmelt runoff modeling.   ASO's investors include NASA, Jet Propulsion Laboratory/Caltech, California Department of Water Resources, and Colorado Water Conservation Board.

[88.]    In early 2019, Brackin contacted ASO about WMI potentially providing a plane and certain equipment for ASO's projects.   Brackin provided proposals to ASO in August and October, 2019 for business to be done in 2020.    In February 2020, Brackin contacted NSM, a competitor of Fargo Jet, about providing a plane for the ASO project.   WMI in the past has always used a plane owned or leased by WMI from Fargo Jet or its affiliate in furtherance of such projects.

26

[89.]   WMI has also recently learned that Brackin, without WMI's knowledge or authorization, had discussions with ASO in mid-2019 about (a) merging ASO with WMI after Brackin closed on his acquisition of WMI and (b) thereafter taking the combined company public in 2020.  Brackin prepared and participated in detailed presentations with ASO and others about the potential merger and post-merger actions.  Without the knowledge or authorization of WMI, Brackin used WMI employees and resources in his efforts relating to the potential merger transaction.  WMI's investigation of Brackin's conduct regarding the ASO project continues.

**4.   Other projects**

[90.]   WMI has worked for many years on projects with the Korean Meteorological Association ("KMA").  WMI recently learned that, in 2019 and 2020 while he was employed by and the President of WMI, Brackin worked on a proposal for WMI Sunag to provide services to the Korean Government with WMI's long-time representative in South Korea.  WMI has also learned that, as part of the proposal, WMI Sunag is proposing that it work with NSM instead of Fargo Jet for the airplane to be used on the project.

[91.]   Similar to Maharashtra, WMI has been working with the State of Karnataka in India for several years with and through KCMC.  Since his termination, Brackin has sought to replace WMI for future cloud seeding projects in Karnataka.

[92.]   Prior to Brackin's termination, WMI was working on a proposal for Indonesia to provide a cloud seeding project and a sale of an airplane for those services.  Since his termination, Brackin has been attempting to direct the aircraft sale to NMS.

[93.]   Brackin had information and knowledge regarding each of these projects and WMI's and Fargo Jet's confidential proprietary information only by virtue of his status as an employee and President of WMI.  As such, he had fiduciary and contractual duties (a) during his employment with WMI to take all appropriate actions in the best interests of WMI and (b) during

27

and after his employment with WMI to maintain the confidentiality of all project-related information.   By virtue of his above-described actions and inaction, Brackin breached his fiduciary and contractual duties to WMI.

[94.]   WMI and Fargo Jet are continuing their investigation into Brackin's actions regarding the above-described and other projects.

## CAUSES OF ACTION

## COUNT I – BREACH OF FIDUCIARY DUTIES
## (WMI AND FARGO JET)

[95.]   Plaintiffs restate and reallege the preceding paragraphs as though fully set forth herein.

[96.]   Pursuant to Sections 34-02-06, 34-02-11, and 34-02-14 of the North Dakota Century Code, employees owe their employer a duty of loyalty during the period of their employment.

[97.]   Pursuant to Section 10-32.1-41 *et seq*. of the North Dakota Century Code, persons serving as governors or officers of limited liability companies have fiduciary duties to the company and its members, including duties of loyalty, good faith (including honesty), care, fair dealing, and avoidance of self-dealing.

[98.]   Brackin, by his above-described actions and inaction, and other wrongful conduct, breached his fiduciary duties of loyalty and confidentiality owed to WMI as both an employee and President of WMI and as a governor and officer of Fargo Jet by diverting projects and money away from WMI and Fargo Jet and improperly retaining, using and/or disclosing WMI's and Fargo Jet's confidential and proprietary information.

[99.]   As a direct and proximate result of Brackin's breaches of his fiduciary duties of loyalty and confidentiality, WMI and Fargo Jet have suffered damages in an amount to be proven

at trial and will continue to suffer irreparable harm for which it is entitled to preliminary and permanent injunctive relief.

[100.]  Brackin's breaches entitle WMI and Fargo Jet to exercise all available rights and remedies, including without limitation, the right to obtain preliminary and permanent injunctive relief and recover compensatory damages, reasonable attorneys' fees, costs and other charges.

[101.]  WMI and Fargo Jet requests judgment: (a) finding that Brackin has breached his fiduciary duties to WMI and Fargo Jet, (b) awarding injunctive relief as appropriate and (c) awarding compensatory damages in favor of WMI and Fargo Jet and against Brackin in an amount to be proven at trial, along with all accrued interest, reasonable attorneys' fees, costs and other charges.

## <u>COUNT II – CONVERSION</u><br><u>(WMI)</u>

[102.]  Plaintiffs restate and reallege the preceding paragraphs as though fully set forth herein.

[103.]  WMI has a property interest in the payments in respect of the Maharashtra project, as well as the confidential and proprietary information that Brackin has taken and used since his termination.

[104.]  Brackin's unlawful taking and retention of WMI's property has deprived WMI of its property rights.

[105.]  WMI is entitled to be made whole for Brackin's conversion.

[106.]  As a direct and proximate result of Brackin's conversion, WMI has suffered damages in an amount to be proven at trial and will continue to suffer irreparable harm for which it is entitled to preliminary and permanent injunctive relief.

[107.]  Brackin's breaches entitle WMI to exercise all available rights and remedies, including without limitation, the right to obtain preliminary and permanent injunctive relief and recover compensatory damages, reasonable attorneys' fees, costs and other charges.

[108.]  WMI requests judgment: (a) finding that Brackin has converted WMI's property, (b) awarding injunctive relief as appropriate and (c) awarding compensatory damages in favor of WMI and against Brackin in an amount to be proven at trial, along with all accrued interest, reasonable attorneys' fees, costs and other charges.

## COUNT III – USURPATION OF CORPORATE OPPORTUNITY
## (WMI)

[109.]  Plaintiffs restate and reallege the preceding paragraphs as though fully set forth herein.

[110.]  As an employee and President of WMI, Brackin occupied a fiduciary relationship to WMI and was prohibited from exploiting his position by appropriating a business opportunity properly belonging to WMI to himself personally or his entities or other entities that he utilized in furtherance of his scheme.

[111.]  By his actions and inaction described herein, and other wrongful conduct, Brackin appropriated business opportunities properly belonging to WMI, including the Maharashtra project and the other projects or potential projects described above, to himself personally or his entities or other entities that he utilized in furtherance of his scheme.

[112.]  By reason of Brackin's breaches of fiduciary duty, all property and profits acquired by Brackin or his entities or other entities that he utilized in furtherance of his scheme relating to the Maharashtra project are subject to a constructive trust for the benefit of WMI.

[113.]  As a direct and proximate result of Brackin's usurpation of corporate opportunity, WMI has suffered damages in an amount to be proven at trial and will continue to suffer irreparable harm for which it is entitled to preliminary and permanent injunctive relief.

[114.]  Brackin's conduct entitle WMI to exercise all available rights and remedies, including without limitation, the right to obtain preliminary and permanent injunctive relief and recover compensatory damages, reasonable attorneys' fees, costs and other charges.

[115.]  WMI requests judgment: (a) finding that Brackin has breached his fiduciary duties to WMI and usurped WMI's corporate opportunities, (b) awarding injunctive relief as appropriate and (c) awarding compensatory damages in favor of WMI and against Brackin in an amount to be proven at trial, along with all accrued interest, reasonable attorneys' fees, costs and other charges.

## COUNT IV – BREACH OF CONTRACT
## (WMI AND FARGO JET)

[116.]  Plaintiffs restate and reallege the preceding paragraphs as though fully set forth herein.

[117.]  The Confidentiality Agreement is a valid and binding contract.

[118.]  The Confidentiality Agreement provides, in relevant part, that (a) "research, production methods, inventions, process methods, software, customer lists, company trade secrets and financial information of all types are extremely confidential, and are the property of" WMI, (b) "any unauthorized disclosure of any such confidential information would be in violation of [Brackin's] responsibilities and this agreement and would injure the Company," (c) "[Brackin] pledge[s] and agree[s] that [he] will strictly maintain the confidentiality of all of this information, and that [he] will only release such information upon the proper authorization of [his] Manager," and (d) "[u]pon expiration or termination of [Brackin's] employment with the

31

Company, [he] will not reveal any confidential information unless specifically authorized and directed to do so by" WMI.

[119.]  By his actions and inaction described herein, and other wrongful conduct, Brackin materially breached his obligations under the Confidentiality Agreement.

[120.]  As a direct and proximate result of Brackin's breach of contract, WMI and Fargo Jet have suffered damages in an amount to be proven at trial and will continue to suffer irreparable harm for which they are entitled to preliminary and permanent injunctive relief.

[121.]  Brackin's breach of contract entitles WMI and Fargo Jet to exercise all available rights and remedies, including without limitation, the right to obtain preliminary and permanent injunctive relief and recover compensatory damages, reasonable attorneys' fees, costs and other charges.

[122.]  WMI and Fargo Jet request judgment: (a) finding that Brackin has breached the Confidentiality Agreement, (b) awarding injunctive relief as appropriate, (c) awarding compensatory damages in favor of WMI and Fargo Jet and against Brackin in an amount to be proven at trial, along with all accrued interest, reasonable attorneys' fees, costs and other charges, and (d) ordering Brackin specifically perform the obligations set forth in the Confidentiality Agreement and cease all actions in violation of his obligations under the Confidentiality Agreement.

## COUNT V – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS (WMI AND FARGO JET)

[123.]  Plaintiffs restate and reallege the preceding paragraphs as though fully set forth herein.

[124.] WMI and Fargo Jet had a reasonable expectation of future economic benefit arising from relationships with existing and prospective customers for projects and potential projects.

[125.] As an employee and President of WMI and as a member of Fargo Jet, Brackin had knowledge of WMI's and Fargo Jet's confidential and proprietary information regarding its processes, specifications, methodologies and financial information, as well as WMI's and Fargo Jet's reasonable expectation of prospective economic benefit related to its existing and prospective customers for projects and potential projects.

[126.] Brackin intentionally interfered with WMI's and Fargo Jet's reasonable expectation of economic benefit without justification by unfairly competing against WMI and Fargo Jet, and soliciting WMI's and Fargo Jet's customers by improperly using confidential and proprietary information.

[127.] As a direct and proximate result of Brackin's tortious interference with prospective business relationships, WMI and Fargo Jet have suffered damages in an amount to be proven at trial and will continue to suffer irreparable harm for which they are entitled to preliminary and permanent injunctive relief.

[128.] Brackin's tortious interference with prospective business relationships entitles WMI and Fargo Jet to exercise all available rights and remedies, including without limitation, the right to obtain preliminary and permanent injunctive relief and recover compensatory damages, reasonable attorneys' fees, costs and other charges.

[129.] WMI and Fargo Jet request judgment: (a) finding that Brackin tortiously interfered with WMI's and Fargo Jet's prospective business, (b) awarding injunctive relief as appropriate and (c) awarding compensatory damages in favor of WMI and Fargo Jet and against

Brackin in an amount to be proven at trial, along with all accrued interest, reasonable attorneys' fees, costs and other charges.

## COUNT VI – UNJUST ENRICHMENT
### (WMI AND FARGO JET)

[130.]  Plaintiffs restate and reallege the preceding paragraphs as though fully set forth herein.

[131.]  As a result of the above-described actions, and other wrongful conduct, Brackin has been unjustly enriched and WMI and Fargo Jet have been unjustly damaged in an amount to be proven at trial.

[132.]  As a direct, foreseeable and proximate cause of Brackin's unjust enrichment, WMI and Fargo Jet have incurred and is entitled to recover compensatory damages, plus pre- and post-judgment interest, costs, expenses and attorneys' fees.

## PRAYER FOR RELIEF

[133.]  WHEREFORE, WMI and Fargo Jet respectfully request that this Court grant the following relief:

[134.]  Enter judgment in favor of WMI and Fargo Jet and against Brackin, granting to WMI and Fargo Jet any and all remedies sought herein;

[135.]  Award WMI and Fargo Jet all costs and expenses incurred herein, including attorneys' fees and costs;

[136.]  Award WMI and Fargo Jet pre-judgment and post-judgment interest, as allowed by law; and

[137.]  Award WMI and Fargo Jet such other, further and different relief to which the Court determines they are entitled.

[138.]  Dated:  April 7, 2020          **TAFT STETTINIUS & HOLLISTER LLP**


By:  _____*s/Jason R. Asmus*_____

    Charles B. Rogers (ND #07415)
    Jason R. Asmus (ND# 09104)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
Telephone:  (612) 977-8400
Fax:       (612) 977-8650
Email:    crogers@taftlaw.com
Email:    jasmus@taftlaw.com

**Attorneys for Plaintiffs Weather Modification LLC and Fargo Jet Center LLC**

State of Minnesota ⎱

County of Hennepin ⎰

**Affidavit of Service**

Ronald Bisson, being duly sworn, on oath says that on Tuesday, April 07, 2020 at 8:19 PM he served the Summons, Complaint, & Exhibits upon Neil S. Brackin, therein named, personally at 15612 Highland Heights Dr, Minnetonka, MN 55345, by handing to and leaving with Kelly Brackin, roommate, a person of suitable age and discretion then and there residing at 15612 Highland Heights Dr, Minnetonka, MN 55345, the usual abode of said Neil S. Brackin, a true and correct copy thereof.

_____  4 / 7 /2020

Ronald Bisson, Process Server

Subscribed and Sworn to before me on

4 / 7 /2020

_____
(Signature of Notary)

TODD J ESSLER
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2025

Drafted By
    Metro Legal Services
    330 2nd Avenue S #150
    Minneapolis, MN 55401
    612-332-0202

*2420863 - 1*



330 2nd Avenue South, Suite 150
Minneapolis, MN 55401
(800) 488-8994
www.metrolegal.com

RE: 40105.2                    -1-

STATE OF NORTH DAKOTA

COUNTY OF CASS

DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

---

Weather Modification LLC, a North Dakota
limited liability company, and Fargo Jet Center
LLC, a North Dakota limited liability
company,

              Plaintiffs,

    v.

Neil S. Brackin,

              Defendant.

Court File No.  09-2020-CV-01132


**NOTICE OF FILING OF SUMMONS
AND COMPLAINT**

---

[1.]  **TO:   Defendant Neil S. Brackin**

[2.]  Pursuant to N.D.R.Civ.P. 4(d)(2)(A)(ii), Plaintiffs hereby provide notice that the

Summons, Complaint with Exhibits 1-16 and Affidavit of Service have been filed with the Court

in the above-captioned matter.

[3.]  Dated:  April 8, 2020

**TAFT STETTINIUS & HOLLISTER LLP**


By: _____*s/Jason R. Asmus*_____
    Charles B. Rogers (ND #07415)
    Jason R. Asmus (ND# 09104)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
Telephone:  (612) 977-8400
Fax:         (612) 977-8650
Email:       crogers@taftlaw.com
Email:       jasmus@taftlaw.com

**Attorneys    for    Plaintiffs    Weather
Modification  LLC  and  Fargo  Jet  Center
LLC**

12515495v1